In the Matter of the Judicial Settlement of the Accounts of HYMAN L. LAPIDES, as General Guardian of LILLIAN LAPIDES LEVIN, Late an Infant, Now of Full Age.

Surrogate's Court, Livingston County, June 15, 1932.

*Austin W. Erwin,* for the guardian.

*Pratt & Pratt [Helen M. Pratt* and *Lockwood R. Doty* of counsel], for Lillian Lapides Levin.

WHEELER, S. This is a proceeding for the final judicial settlement of the accounts of Hyman L. Lapides, as general guardian of the person and estate of Lillian Lapides Levin, above named.

The general guardian charges himself with receiving $1,000, and also with interest at the rate of four per cent to the date of the filing of the account, amounting in all to $1,176.65, and credits himself with cash advanced to his ward for the education and expenses of his ward at the Starrett School for Girls, located at Chicago, Ill., in the amount of $1,135.50, leaving a balance on hand, subject to the commissions and expenses of his accounting, of $41.15.

These disbursements were made by the general guardian without application to the Surrogate's Court for an order authorizing such expenditures.

The ward objected to the account, contending that the payments were unauthorized and unwarranted, and asks that the general guardian be required to pay to her the sum of $1,000, with interest at the rate of six per cent.

The ward, Lillian Lapides Levin, was born in 1908 and her mother died in the year 1919, and her father, Hyman L. Lapides, was appointed the general guardian of her person and estate April 11, 1919, and in the year of 1921 her father and general guardian remarried.

After her mother's death she went to live with her grandmother in New York city, attending the public schools.

In the year 1922 she entered the Rochester Business Institute and in June, 1923, graduated therefrom. She was then given a position with her father until September, 1923, when she entered the Starrett School for Girls at Chicago, remaining there for the term and then went to New York city without the knowledge of her guardian and secured a position as typist and bookkeeper with the Rogal Furniture Company, and while there lived with her grandmother.

This contest centers about the right of the guardian to expend his ward's estate for educational purposes at the Starrett School for Girls at Chicago without application to the court.

It was the legal duty of the parent, if of sufficient financial ability, to support, maintain and educate this minor child, and where the

parent is also the guardian, the circumstances of the parent as well as his ward's estate may be taken into consideration in determining the liability of the parent to pay for the education of the ward.

It is the proper practice where the ward's income is insufficient for the suitable and proper education, to apply to the court for leave to employ so much of the principal as may be required for such educational purpose.

The right of the guardian to the custody of the person of the ward carries with it the obligation to provide for the proper support and education and upbringing of the ward. It is one of the first and highest duties of a general guardian to provide for the education and maintenance of his ward and in a manner fitting her station in life, and, where the income is insufficient, resort may be had to the capital, if justifiable.

Where, however, the guardian does encroach upon the principal, without securing the order or direction of the court, the court may in a proper case, if it has been for the welfare of the ward, sanction such expenditures made in the ward's behalf. (*Voessing* v. *Voessing*, 4 Redf. 360.)

The test for determining whether the expenditures should be allowed to the guardian in his account is whether he acted in good faith and with reasonable discretion in making such expenditures (28 C. J. 1117), and was financially unable to provide for her education.

Concerning the financial condition of the parent (guardian) and his ability to educate his minor child, the record discloses: "In 1918 I had lost practically everything; in 1921 burned out and lost all our stock and lost upwards of 30 to $50,000.00 worth of stock — no insurance.

"In 1922 when the ward started for school, I will show by my bookkeeper that we were not doing a good business. After the fire, in 1922 I was not in a position to spend a dollar.

"In 1923 I borrowed money on my life insurance policy and in that way I financed her schooling.

"I had two policies of $1,500 taken out in 1913 and 1915, and I borrowed $375.00 on one and $325.00 on the other. This money was deposited in the bank to my credit and I checked out that $585.00."

The bookkeeper testified in substance: "The bank balance of the guardian in 1923 was practically nothing; that the business owed upwards of $20,000.00.

"I mean from that time, 1922, no bank balance, no profit in the business since 1922.

"At the time of the hearing, no property."

" Last year we done $60,000.00 worth of business and had $30.00 to the good.

" The parent had an income of $2,000 a year."

There is ample proof before the court that the father was not financially able to pay the expense of his minor daughter at the Starrett School for Girls. In fact it was necessary for him to borrow upon his life insurance policies sufficient money to meet the required payments.

A serious question is raised which relates to whether the guardian was justified in expending his ward's money for her education at this private school, for which he claims credit in this accounting.

What does the record disclose that would justify the guardian in spending his ward's estate for her education, as claimed?

Reference to the record in that connection shows: " She refused to go to school ever since I was married in 1921 — trouble all the while — discontented; we had trouble about her going to school before I married. The trouble was ever since the mother died. I never could control the girl. When her mother was alive she could take care of the girls. After she died I could not tell her — she would not go to school. I would go to business at seven in the morning and come back and she had not been to school. The housekeeper at the house would tell me. She would start for school; I knew she was not in school. She would not go to school, she would run around town and all over. Discontented about the town, did not want to stay there — it was too small for her. She said she wanted to go to a private school. I told her we could not send her to school. She said she had some money coming to her from her mother's estate and that it would not be any more than right to use the money and that I should send her to school.

" In 1922 and 1923 she was at Rochester with her grandmother. She would not stay at home, we simply knew she was at her grandmother's.

" She started at the Rochester Business school; afterwards I had her in my office. I just tried to keep her off the streets.

" There was a time when I appealed to Justice ALVERSON; I felt it was necessary; she was running around with boys after twelve and one o'clock — Tom, Dick and Harry.

" Later I took her with me over to Mr. ALVERSON's. She told me she would not go to school at Dansville. She was tired of Dansville and wanted to go to school in some big city; she wanted to go to this school because it was in a big city.

" We had both written letters inquiring and at her request we settled upon the Starrett School for Girls at Chicago."

The stepmother testified in substance: " While the girl was in

Chicago at school she [the stepmother] wrote to her once and twice a week and sent her things and she never answered. The father did everything in the world for her.

" Whenever she wrote him for money or wanted it, I told him to go ahead and send it.

" I talked with the grandmother when the girl was at the R. B. I. at Rochester, which was in 1922. She told me that she could not do anything with her.

" She wanted to take up bookkeeping and accounting; there was a commercial course prepared by this Starrett School for Girls. I wanted her to live up to the rest of the girls."

The ward testified positively that she knew nothing about having any property coming to her from her mother's estate until long after it had been expended for her education, and she also denied that she was in Justice ALVERSON's office on only one occasion, and Justice ALVERSON was produced by the guardian and testified in substance: " She came to my office with her father; the conversation was to the effect that there had been some family difficulty. The girl was not going along just right; she was not doing just what they thought she ought to and Mr. Lapides asked me to have a talk with her.

" I talked with her relative to the general conditions at home and why she was not performing her part as they thought she ought to.

" The next day, however, she came to my office alone, after we had had a talk the day before, and told me that she did not want to say it in the presence of her father because he had been very good to her and she did not want to hurt him, but she wanted to tell me the real difficulty was that she wanted to go to school. [This second visit was denied by the girl, who claimed she was there only once.]

" She said that her father always claimed that he was unable to send her, *but that she had some money coming to her from her mother's estate: that her father took over her mother's property and she thought that might be used.*

" I told her that if she wanted me to, I would see Lapides, talk with him about it and see what could be done along that line.

" I called Mr. Lapides into the office, told him what was desired and told him also I believed it would be a just thing for him to give her a chance.

" Arrangements were made to my knowledge that she was to go away to school. She came back a couple of days after and told me that it had all been arranged and that she was going to school, and after she had been to school she came back after the term was ended and thanked me for interceding for her."

Cross-examination for ward: " I had a talk with Mr. Lapides and the daughter first.

" There was some dissatisfaction in the family; I hesitate to tell it, but the daughter had not been performing any of the duties in the house; she had not even taken care of her room and she would not do any of the housework and did not want to go to school to the Union School at Dansville. She did want to be on the streets more than she ought to * * *; that is the cause of it and what we talked about.

" The daughter was present and she made no replies to those accusations.

" She told me that one of the difficulties in getting along with the household was that there was not a great deal of difference between her age and that of her stepmother and it was not like her own home when her mother was there.

" She said she did not want to go to the Union School at Dansville, but wanted to be fitted for entering business. *Said her father had some money belonging to her that came from her mother and wanted to know why that could not be used.*

" My recollection is clear on the subject and her referring to her own funds, because that was the matter that I afterwards discussed with Lapides and talked with him about it.

." She came to me afterwards and told me that her father had arranged and was going to furnish the money and allow her to go to school — *the money that was coming to her*. I am very clear on that point."

The guardian further testified: " There was not much of anything that I could do to send her away to school.

" At the Chicago school she was kept under strict discipline; she was under control; that was the reason she was sent there."

It is urged that the guardian was anxious to be well rid of the girl because of friction in the family, resulting from his second marriage. In that connection the record discloses that she was interrogated relative to the relationship existing between her and Mrs. Lapides. " Q. Was there any unfriendly contact between you and Mrs. Lapides? A. No more than usual — I might say there was a little on each side — I might say — Q. No unfriendly feelings? A. I should say yes, but due on my part to the fact that they sent me away and brought her into the house and the shock of finding her there, and on her part, of having a daughter five years younger than she. Q. Was there anything in the arrangement there that concerns your conduct toward Mrs. Lapides as to disobedience? A. I do not believe there was any. Q. Do you think that entered into it? A. Not so much. Q. You did not feel that you were sent away on that account. A. No."

It seems pertinent to inquire into the character of the school to which the ward was sent, resulting in the disbursements claimed. The ward testified: " It was a medium school; that she was always properly chaperoned; that she was taught deportment; that her deportment was supervised; that there were about 35 boarding students and 200 day students; that the school had a fair social standing in the community; that some of the girls were physicians' daughters and that the social contacts were better than she could have obtained at the Dansville High School. That her deportment outside of the school was supervised by the teachers.

" That the supervision under all circumstances was proper.

" That the training she received there at the school had its advantages; that the Fraternity of the Chicago University attended some of their social functions.

" That the school was between a fashionable and a low class school; that it was considered a nice place."

The father spent considerable sums of money upon this girl from time to time — substantial sums. " I paid my daughter's tuition at Rochester Business Institute prior to the date when she went to Chicago to school and I paid her board during that time while living with her grandmother at Rochester.

" When she left the Starrett School she went to New York City and stayed at the home for Jewish girls and later she got in touch with her aunt in New Haven and went to live with her.

" I sent $300.00 to her aunt for her benefit."

The record shows that the ward shortly after her mother's death, and when she was between the immature ages of eleven and fifteen, was beyond the control of her father and desired, as she expressed it, " social contacts; " that he became fearful of the reputation of his daughter and remonstrated with her from time to time relative to her conduct, which seemed to have but little effect upon her deportment.

She spent a great deal of time away from home, in Rochester with her grandmother and in New York city with another grandmother, and was thus going about at a very tender age, and as a result of the girl's conduct and deportment, the father as a last resort took her before Justice ALVERSON, and counseled with him concerning the advisability of gratifying the girl's wishes and desires to be sent to a private school for girls; the situation was discussed before Justice ALVERSON on several occasions and finally resulted, through the intervention of Mr. ALVERSON in the girl's behalf, in prevailing upon the guardian to spend the ward's money in sending the girl to the Starrett School for Girls, and upon her return she personally thanked

Justice ALVERSON for influencing her father in permitting her to attend this school.

If this general guardian had made application to the court prior to his expending the moneys in question for education of his ward at the Starrett School for Girls at Chicago, and had shown on such application what the record discloses here as to his financial condition, and that his daughter desired education at this private school and that the school was a suitable, fit and proper one and that she would not live at home with her father and was spending a great deal of her time with her grandmothers in Rochester, N. Y., and in New York city, making only occasional visits at home, and was almost wholly without the control and supervision of her father and was being subjected to the usual temptations which beset a girl of immature years and judgment when away from home influences, and was fearful of her character and good name and that she was in need of proper supervision, under all of those circumstances the court would not have hesitated in granting the application for leave to employ her funds for education as claimed for in this accounting.

The best interests of the ward are to be subserved at all times. That is the guiding rule that controls. No flexible rule can be used. Each case must be determined upon the facts peculiar to the case at issue. The leading case in this connection holds: " The proper course to pursue, when the income is insufficient, is for the guardian to make application to the Court for leave to use so much of the principal as may be necessary * * * ; *but in case he proceed without leave, the Court may, if the proceeding seems to have been wise, and for the welfare of the ward, sanction it.*" (*Voessing* v. *Voessing,* 4 Redf. 360.)

The Surrogate's Court Act, section 194, provides: " Upon the petition of the guardian of an infant's person or property; or of the infant; or of any relative or other person in his behalf; the surrogate, upon notice to such persons, if any, as he thinks proper to notify, may make an order directing the application, by the guardian of the infant's property, to the support and education of the infant, of such a sum as to the surrogate seems proper, out of the income of the infant's property; or, where the income is inadequate for that purpose, out of the principal."

The general guardian mingled the funds of the ward with his own funds and for his own benefit or convenience, and he is chargeable with interest from the date of such conversion at the rate of six per cent to the time that he expended the same for the education of his ward at the Starrett School for Girls at Chicago. (28 C. J. 1147, 1148.)

The court, therefore, reaches the conclusion:

*First.* That the expenditures made by the guardian on behalf of his ward as claimed in his account, amounting to $1,135.50, are allowed as filed.

*Second.* That the guardian is chargeable with interest at the rate of six per cent from April 12, 1919, to the time of the expenditures set up in the account.

*Third.* That decree may be submitted accordingly and that upon the presentation of the decree, applications for allowances shall be heard.